The first case for oral argument is Estate of Enoch. Counsel, whenever you're ready, you may proceed. Thank you. First, I must apologize for my voice. I have come down with a summer cold over the last 72 hours. It was strategically timed so that I could be here in court and intersperse coughing with my argument, and I will try not to do so during this case's argument in response. My name is Eric Dorkin, and I represent petitioners and the appellants, Shirley Griffith, who's in court today, and Shirley Swanson. Obviously, I'm here to tell you that Judge Kelly got something wrong in his decision, and I want to be clear on exactly what the error, I think, was, and that is not that Judge Kelly properly stated the presumption of undue influence in this case. He properly cited facts in support of his finding that the presumption of undue influence applied in this case, and he properly stated the standard that it was clear and convincing evidence necessary to rebut the presumption of undue influence in this case. But Judge Kelly, in reaching his decision, cited a series of facts in response or in support of his claim, his position that the presumption had been rebutted. And there are four general ones, and for completeness, I will cite what I think Judge Kelly referred to. The numerous witness testimony that Ms. Enoch, Marjorie Enoch, the decedent, was a strong-willed woman, that she was not suffering from dementia, that she had been angry with the petitioners sometime in her life, and that she was afraid that the petitioners might stop the grandson from farming the relative farm property in the case. Here is what I'm not arguing. I'm not arguing that that evidence would have been insufficient to support the judge's position. I think if that was the evidence in the record, I would not be here in front of you. But that's not the only evidence in the record. And it's the remaining evidence in the record that is not referenced in Judge Kelly's opinion, that in my mind renders what he said against the manifest way of the evidence. And there are, I think, three classes or pieces of evidence that are crucial in understanding why I think Judge Kelly was incorrect. The first class is impartial third-party testimony. And there's three people whom I'll talk about in a moment, Jim Schwarman, Sarah Helton, and Cindy Daniel. In fact, Mr. Schwarman, who was the manager, managing the farm, his credibility was expressly, Judge Kelly found him to be a credible witness. The second class evidence was Katherine's own inconsistent testimony. And that has relevance to Judge Kelly's own statement in his opinion that he found her to be an inconsistent witness. And the third class of evidence is the underrunning testimony of Sheila and Sherry as to things Katherine even said to them that would support a finding of undue influence. So returning then to the impartial third-party testimony. Jim Schwarman testified that Marjorie was interested in making some changes in her will, and Mr. Armstrong was not interested in helping her do that. Now, Mr. Armstrong is Jim Armstrong, and he had been Marjorie's estate planning attorney for 17 years. He also was the lawyer for the trust that had been established following the death of Marjorie's husband, Woodrow. Then, at some point in around October 2009, Marjorie pertains to new counsel, Robert Elman. Now, what do we know about the undisputed facts that give us pause about Mr. Schwarman's statement? Mr. Armstrong testified that he never heard a word of dissatisfaction from Marjorie. And he was personally surprised when he received a call from Mr. Elder saying that Mr. Elder was probating a different will after Marjorie had passed. So we have this testimony from Mr. Armstrong that he had no idea, and that he had no idea why, he had been replaced. And yet, we have Mr. Schwarman, who the trial court found to be credible, telling us that Marjorie told him that Mr. Armstrong was not interested in helping her make changes to her will. Let's take it as a given that all of these elephants of evidence are in the record, and they are, as you say, and I've read both of your briefs, and I'm sure they are. Why isn't this a question of the weight that the prior fact gives all this as opposed to conflicting evidence, which is sort of the daily bread and butter of a trial judge? I think, coming back to the presumption, that the standard for rebutting is clear and convincing evidence. And I think the weight of the evidence on the other side, we have this law school, you know, how much is a preponderance? It's a little bit above 50%. And clear and convincing is probably above that. How far above in percentages, it's hard to say. So the question then becomes, it's not an ordinary weighting that, yeah, I think this weighs more than that. When the burden has now shifted to the respondent to show by clear and convincing evidence that it was fair, I think, again, it's not just one piece of evidence. I think it was one piece of evidence. I think you'd be right, the trial court was okay to look at that one piece and say, even without comment, rule a different way. But I think when you add up the pieces of evidence, it reaches such a point that even without comment, it shows that it's against the manifest way of the evidence. Because I'm relying on statements by witnesses that the trial court found credible. But that's the, you know, at the end of the day, and so I've got the three, Jim Schmoyer, Sarah Heltman, Cindy Denning, and Kathleen's own dishonesty, which the trial court himself noted that she's mentioned inconsistent statements. So I think, were it a preponderance of the evidence case, I would probably be in a weaker position on simply, he just weighed the evidence. But the burden had then shifted, and they had to show by clear and convincing evidence that this will was free from undue influence. And then I think when you take this evidence in conjunction, the statement from Mr. Schmoyer, the statement from Ms. Heltman about Thanksgiving, that wasn't true, that she heard from Marjorie. And Cindy Denning's statement that Marjorie was afraid that she'd be left in the lurch. I think when you look at those three statements, and you combine them with Kathleen's own inconsistencies, I think at that point, it is against the manifest way of the evidence. Okay. I don't know if the court would like me to go through the facts. I know the court has stated that I could go through each one of those. However you wish to argue, sir. Thank you. Looking to Ms. Heltman's statement. Ms. Heltman's statement was that Marjorie knew that her kids, Sheila and Sherry, were going to be upset about living well because she was making some changes, and that it was because, or at least in large part, they did not come to see her for Thanksgiving in 2010. That's what Sarah Heltman was told by Marjorie. Again, Jim Schwarman was told something by Marjorie. Sarah Heltman was told something by Marjorie. It turns out that wasn't true. And it wasn't true because, as we know from trial, Kathleen testified that no, Marjorie was in the hospital for Thanksgiving 2010, and Sheila testified that they saw Marjorie in the hospital for Thanksgiving 2010. So now we have two events relatively close in time to the time of the will, August 27, 2010, where Marjorie, again, I have no reason to believe that Mr. Schwarman didn't tell the truth. I have no reason to believe Ms. Heltman didn't tell the truth. And the record doesn't indicate that there's any reason to disbelieve them. They each told the trial court something Marjorie told them that wasn't true. And Marjorie doesn't have to mention it. And there's nothing in the record, and no one has ever said, that Marjorie is dishonest. So that is evidence at or about the time that the will in question was prepared that suggests that there is undue influence in the background, and certainly not that, by way of convincing evidence, it was free from undue influence. Ms. Denning's testimony was asked by Mr. Gates, did Marjorie ever express any concerns to you that if she made the responding Kathleen Wagner mad, Kathy would leave her in the lurch? Denning said, yeah. She was told that. Now, counsel would agree, suggest that she didn't mean it. Now, the time we found that if she really meant it was when he was asking her the question. She said, yeah. And he didn't ask about it. He didn't say, excuse me. Was that an inaccurate statement? Did you mean no? What did you mean, yeah? The answer, he let the answer stand. So again, I have three witnesses that I think independently would suggest that the decision was against the manifest way, but all three in total. But then I want to look at Kathleen's testimony. Because in finding the presumption applied, Judge Kelly, the third prong is the procurement prong, and he found that Kathleen had procured the will for Marjorie. But to do that, he had to find that Kathleen lied on the stand. Because Kathleen unequivocally said two things. One, I didn't know she was making the will. And two, I only found out about the will after Marjorie died. That's her testimony in court. To find procurement, Judge Kelly necessarily had to find that those statements were not true. And he accepted the testimony of Robert Eldred, the lawyer who prepared it, that Kathleen did, in fact, call him for the first will and for the last will. Because he prepared four wills for Marjorie in very short succession. And for the fourth will, Kathleen called him, said my mother wants to read to her will, drove her, drove Kathleen, drove Marjorie to his office, was in the office when the witnesses came in, left the room, came back after the signing. So based upon those facts, the trial court found that she procured it, and in connection with that, mentioned that she had inconsistent statements. I think her statements were far more than inconsistent. They were fundamentally dishonest on the single most important fact. Did she work to procure her will? And she did. Given that she was dishonest about this fact, I think that independently would weigh against Judge Kelly's final. But I think when you combine that with the independent testimony of three witnesses, I believe Judge Kelly's opinion was against the manifest way of the evidence in finding that the respondent had found, had proven that the will was fair and equitable and free from undue influence by clear and convincing evidence. Thank you. Thank you, Counsel. Counsel? Thank you. My name is Gordon Gates. I represent the estate of Marjorie Enoch. I think that I'll start my response with a reading from the appellant's reply brief, wherein they state, to be clear, given the deferential review afforded the trial court, factual determinations, the October 2nd order presents a factual record that could support a finding that Kathleen had rebutted the presumption of undue influence. To me, that's a pretty significant concession, and Mr. Dorkin repeated it in his remarks the first thing out of his mouth when he took the podium today. They concede, as they must, that sufficient facts were introduced to rebut the presumption, that those were reliable facts. They were entitled to be believed by the court. They were not irrational. They were reasonable and believable. And number three, that as applied to the accepted law, the court's order was correct. That's what he said in his reply brief. That's what he said now. So that sounds like my case. And if I try to figure out from after that concession and after that argument what's left, what we have is simply this, and it describes its entire appeal. I had some facts, too. That's the entire case. They say all the facts that we presented were accurate, believable, not irrational. The judge was entitled to believe them, and the law was properly applied. But we had some facts, too. Well, first of all, I don't believe they had any facts that were relevant. And second of all, they make the argument that the court ignored those facts to the extent they existed. I think it's clear from the judge's very lengthy and well-thought-out decision that he didn't ignore a single thing. He simply made the decision that all trial judges must, and that is he made the decision what evidence was most reliable, what evidence was irrelevant and not worth discussing, and then probably more importantly in this case, what evidence overwhelmed the facts that the opposing party presented. And then every fact that the appellant, the plaintiff, the petitioners brought up in their brief and brought up today were discounted by one of those three things. The judge either decided they were unreliable, that they were irrelevant facts, or that they were grossly overwhelmed by the evidence, the bulk of the evidence. So Your Honor mentioned let's assume the facts are true. Don't we have just a simple contest of facts? And the fact of the matter is that's exactly what we have. And as you saw from the briefs, and obviously this is something this court is well-versed in, and that's the standard of review. You all know what the standard of review in this case is. We've cited all kinds of cases to you. But the situation is this. So long as we presented sufficient evidence, the fact that the opposing party had some evidence really doesn't matter today. It mattered in the trial court. It doesn't matter here. The trial court was entitled to take a look at the evidence that they presented, decide whether it mattered to them. If it didn't, the court was entitled to discount it and rule in our favor. That is not what makes appeals. I have some facts, too. That's not an appeal. So let's just briefly talk about the facts that they think courts should have relied on and the facts that they think are the manifest weight, which is, of course, where we are. They've listed three or four facts. There's, I guess, four, but they kind of combine into three. And I'll point out that those three or four facts are in response to reams of testimony by our witnesses. And our witnesses, by the way, are independent witnesses. Our witnesses are not the petitioners, are not the respondent. Our witnesses are attorneys, CPAs, bankers, friends from church, friends from the neighborhood, caretakers of Marjorie, Marjorie's doctor. Those are where our facts came from. Their facts come from the petitioners. That's where they come from. So when we start looking at this thing, and as Your Honor noted, it's the weight, it's the balancing. I think clearly the manifest weight of this sits so heavily on our side, it's difficult to really understand where they're coming from. Let's talk about their facts. The first fact. Let me ask you this before you start. You're not, the way I understand your argument, you're not arguing the number of witnesses but what they said. Absolutely. Okay. And not only what they said but who they were. Because to me and to the court, I think it matters who they were. They were not biased witnesses. They were people who had nothing to gain or lose from this will. So, yes, we tried, as I think it's clear in the record, there were 22 or some disclosed witnesses. Not all of them took the stand. It wasn't a I'm going to trot up six and you only trot up three, therefore I win. Okay. The point I'm making is we trotted up six independent witnesses, they trotted up two themselves, the plaintiffs. But the question of independent versus having an interest, it's still part of the mix of credibility that a trial judge has to determine. Exactly. Okay. And I think that who they are is probably more important to that question than how many of them there are. If he can look at them and say you have no reason to lie to me, you have no reason to hedge the facts, I think that matters. And I think we start out with that when we talk about this bizarre, and I think that's the best description for it, answer by Cindy Denning. Cindy Denning was a friend of Marjorie's. Cindy Denning testified for pages and pages and pages of facts that were in support of the will itself. She was a fairly important witness to describe Marjorie's character, Marjorie's wishes, Marjorie's life. And also it was important to testify, and she did on several occasions, that she did not see any evidence whatsoever that Kathleen had any ability to control Marjorie. She testified to that on several occasions throughout the trial. That's principally why she was on the witness stand. This answer, yeah, was a weird answer. It's a weird answer in the sense that I didn't know it existed until I got the trial transcript. If you go back and Your Honor has the transcript, and if you read this yeah answer in context, I submit to you that it's utterly meaningless. It's clear to me that Ms. Denning, who had been on the witness stand for a considerable period of time, had listened to and sat through 16 separate objections by the petitioner's attorney. Detailed ruling by the trial court was ordered to sit back and listen while the lawyers argued that when she gave this yeah answer, she did not mean an affirmative yes to the question that preceded it. She, in my opinion, was answering the question from the judge, you can answer now. We're done arguing. The judge has ruled. You can answer now. I think that's the yeah that she gave us. In any event, I mean I can't explain it. I don't remember it happening. It's in the transcript. It's there. If you look at her testimony in totality, clearly that is such an anomaly. And I think I pointed out in the brief, because it was instructed to me, she's an English teacher. She answers yes. She does not use the yeah. She finds that to be common. If you look at her answers, they're all yeses except for this one yeah. I can't explain it. But the point is, who cares? Let's assume that she did actually say yes. That is not the manifest way to the evidence. That question does not overcome all of the rest of the evidence that's presented. Then I also have to deal with this argument about Kathy being a liar. First of all, that was never approved. Kathy was not proved to be a liar. Yeah, she had some statements made in her deposition that were inconsistent with her trial testimony. Happens every day. That's why it's called impeachment. She was inconsistent on a couple of facts. But at the trial, her testimony was consistent with the rest of the evidence presented. Now, I don't think there was ever any evidence that Kathy was a liar. The judge found her testimony to be inconsistent, and I agree with him. The point I would like to make is, who cares? Our case did not depend on Kathy and Wagner. This is not Sheila Griffith versus Kathy and Wagner in the trial sense. It clearly was in the personal sense. Our case did not depend on Kathleen. Their case did not depend on Kathleen. Kathleen could have stayed home, and this case would have been tried exactly the same way. Their brief makes the point of, well, we should have proven our case by Kathleen. I'm completely stumped by that. I have no idea why. Kathleen is a biased witness. There was no way we were going to try our case based upon Kathleen. We tried our case based upon independent witnesses who had no reason to lie, had no reason to hedge. So assuming, let's assume for the purposes of argument that Kathleen is a liar, as they assert, who cares? It doesn't change this case. They didn't depend on her testimony. I didn't depend on her testimony. It's utterly irrelevant. Mr. Gates, I'm going to ask you a little bit about Attorney Armstrong. I gathered that there was just a pretty extraordinary number of wills and codicils, amendments, and I have not viewed the entire record yet. But I believe in your brief you made the statement that there had actually been a will that Attorney Armstrong had made seven years prior that was very unequal and very similar to the will that was finally probated. Correct. He not only made a will, he made five wills that were utterly consistent with the will that we have now. There is a demonstrative exhibit that you can find in the record that was introduced that I prepared that shows all the wills that Armstrong prepared and what they said, because otherwise it is a morass. But if you look at that, from 1989 through 2009, he wrote, I think, five or six wills and codicils, and they were all consistent, cutting out Sheila and Sherry, not cutting them out, but leaving them consistently lower amounts. There was a will in 2007 that got closer to an equal distribution. That was it. Otherwise, it was consistent that Sheila and Sherry were to get considerably less than Kathleen. And Armstrong, when you review his notes, which the court properly stated were rather persuasive, you can see that Attorney Armstrong was patently uncomfortable with this unequal distribution. And as a result, he listed page after page of handwritten notes about where he inquired about her, are you sure you want to do this? This is very unlike what your husband did. And he grilled her and then made a big, long colloquy about how he was convinced that this is indeed what she wanted to do, and he explained why she wanted to do it. And these are all contemporaneous notes? Those are contemporaneous with the wills from 1989 through 2009. And I think that's important that you bring up. It's not an argument that we made in the brief, but it's important to realize that the will that we're fighting about, the will in August of 2010, is the same will, essentially, that was written in 1989. So any one of those wills would have had the same effect on Sheila and Sherry. So in my mind, the notes of Armstrong are, in fact, contemporaneous with the will that was written in 2010 because it's the same will. He made minor changes about pieces of real estate and all that kind of stuff. But fundamentally, his wills were the same as Elder's wills. So I think the judge was very persuaded by Armstrong's notes, as he should have been, and Armstrong was very persuasive on the witness stand. But interestingly enough, again pointing to Your Honor's comments about bias and credibility, Armstrong was not terribly pleased to be there. He had been removed. He was not her lawyer, and yet he provided testimony that was absolutely believable, absolutely credible. No one challenged what he said, and certainly no one can challenge his contemporaneously prepared notes. In fact, some of the notes that we put in in a trial in 2014 were notes from 1989 to 1990. He kept them. He maintained them. There was no question that they were factual. And they described more importantly than what the will said, he gave the explanation as to why she did it. And that, I think, is the final point here is their arguments at trial were this will wasn't fair. That's it. That's what it comes down to. This will wasn't fair. I would submit to you, based upon the evidence that we have from Armstrong and from the other family members, fairness is in the eye of the beholder. And to Marjorie, based upon the trouble she's had with Sheila and Sherry, this will was very fair. Mr. Schwerman, who had a lot of reason to know the facts, testified that he was surprised by this will. He was surprised that Sheila and Sherry got anything. So this argument that the will wasn't fair is a red herring because it was fair. Armstrong explained that Sheila and Sherry had, since 1989, taken physicians that were directly contrary to what Marjorie wanted to do, that Marjorie was sick of their micromanaging, and that, as a result, she changed her will. And the best evidence, in my mind, you'll find in the record of the explanation for this will, is a letter from Sheila or Sherry to their mother expressing frustration with the fact that Marjorie wouldn't let Sheila and Sherry run her financial affairs. And sent her a letter saying, why won't you let us run your affairs? You apparently want to cut us out of this part of your life. And they went so far as to hire a lawyer to challenge their mother's operation of the farm assets. I don't know what else I could possibly present to explain why Marjorie said, that's it. I'm done. You guys are not going to get as much as Kathleen. You've tried to ruin my life, and you've fought with me, and we're not going to do that anymore. Was Marjorie competent to the end? Absolutely. Absolutely. There's absolutely no evidence that she was incompetent. In fact, there was compelling evidence both from her doctor, Dr. Tortell, which, interestingly enough, was the employer of one of the petitioners. One of the petitioners sitting in the courtroom was his nurse assistant, whatever. He testified clearly that to the day she died, she was fully competent. And not only fully competent, she was strong-willed, opinionated, and somewhat difficult to get along with. So that evidence is compelling, not just because there was no evidence that she was incompetent. But it is one of the factors that the courts have looked at. Is this woman of a type of character that she could be easily persuaded by? And everybody said, oh, heavens no. If you want her to eat a chicken salad sandwich, don't tell her to eat a chicken salad sandwich. Tell her to eat a tuna salad sandwich. She'll eat the chicken salad sandwich. She is a tough bird, was to the day she died. And I think that was something that came across in spades at the trial. And the court makes much notice of it in his final opinion. If there's nothing else, thank you. Thank you, counsel. Counsel? Yes, sir. Mr. Gates raises a couple of points, one of which I think is the important point in the case. Mr. Gates sort of glosses over it. He says that the unequal distribution in the elder bill is the same as the unequal distribution in the arms trial. This goes to your question. That's not true. In 2007, James Armstrong prepared a will that put all of the real property in trust on Marjory's Pass. And the income went one-third to Sheila, one-third to Sherry, one-third to Kathleen. The property to be distributed upon the death of all three. So in 2007, all of the bad blood from the 90s, and I'll mention that letter that talked about what they were fighting about, but all of the bad blood in the 90s was done. James Armstrong prepared a will and trust in 2007 that made a deal. What about 2008? In 2008, Mr. Armstrong did a consulting will and amended it to the trust. Well, what did he do there? Well, Marjory wanted to make sure that Ashley, her grandson, and Kathleen's son could farm the property until he died or no longer wanted to farm the property. So the 2008, so now 2007 is a third, third, third to the girls. 2008, it remains one-third, one-third, one-third. The only difference being that now the property isn't distributed outright on the death of the three girls. It's distributed outright upon the death of the three girls and Ashley. So in 2008, whatever bad blood had existed between Sheila, Sherry, and Marjory was done. Now, what was this lawyer they hired? Well, what happened was the Woodrow Enoch Trust that I mentioned had the trustees as Sheila, Sherry, and Kathleen, and Marjory was acting as the trustee of the trust improperly. And eventually, Marjory ceded to the advice of Mr. Armstrong back in the 90s that she couldn't do that. That's what that dispute was over. It's not that we're going to control your affairs. The trust document doesn't allow you to be the trustee. You get to manage. What happens is they, in 1991, the first wills, which were not unequal, the first will was prepared simultaneously with Woodrow and Marjory. And when Woodrow passed soon after, all of his interest in the property went to the trust. All of Marjory's interests were made in person, and so that they were managed simultaneously. Facts from petitioners. That's what he said, that we rely on the facts of the petition. I didn't mention the petitioners here today. The facts I mentioned were Miss Denny, who said it must be meaningless. You know, she testified inaccurately. I don't know why she did it. All I know is she took an oath to tell the truth. The only answer he doesn't like is the answer that doesn't work for him. But I cite Denny, Pelton, Schwarman, and Armstrong. That's all I've talked to you about today. That's the testimony that I think is against the manifest way. There's no evidence that she's a liar. She said she had no idea that the August 27, 2010 will even existed or that it was being prepared. Elder said she called him specifically to do that. She drove her mother there. That makes her a liar. I don't need a judicial finding. I have two facts. The testimony of the lawyer that prepared it said she called the witness saying, I didn't know about it until Marjory died. The will not fair. No. My complaint is that the will is the product of undue influence. It's that simple. And finally, strong will. Anybody with a strong will can be directed if they're told things that are untrue. And I submit to you that what Marjory told Sarah Helton was untrue. What Marjory told Jim Schwarman was untrue. And if that led her to do what she did in preparing the will with Robert Elder, her strong will not be standing. It's the product of undue influence. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take this matter under advisement.